UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

STEPHANIE WOOD,

    Plaintiff,

     v.

CHIROPRACTIC CENTER, PA d/b/a
WALDOBORO CHIROPRACTIC & SPA,
P.A., d/b/a WALDOBORO CHIROPRACTIC
& MASSAGE

    Defendant.

Civil Action No.

## COMPLAINT
## JURY TRIAL REQUESTED
## INJUNCTIVE RELIEF SOUGHT

### JURISDICTION AND PARTIES

1.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

2.    Stephanie Wood ("Ms. Wood") is a United States citizen residing in the State of Maine, County of Lincoln, Town of Waldoboro.

3.    Chiropractic Center, PA d/b/a Waldoboro Chiropractic & Spa, P.A., d/b/a Waldoboro Chiropractic & Massage ("Waldoboro Chiropractic") was a Maine business corporation that had a place of business in State of Maine, County of Lincoln, Town of Waldoboro.

4.    This Court has subject matter jurisdiction over Ms. Wood's claim pursuant to 28 U.S.C. §§ 1331 and 1367.

### JURY TRIAL REQUESTED

5.    Ms. Wood requests a trial by jury for all claims and issues for which a jury is permitted.

FACTUAL ALLEGATIONS

6.      Waldoboro Chiropractic provided Chiropractic, Physiotherapy, Chiropractic Acupuncture and Massage Therapy services to the public.

7.      Dr. Tillou is a Chiropractor and the owner of Waldoboro Chiropractic.

8.      Ms. Wood began working for Waldoboro Chiropractic in October 2017.

9.      Ms. Wood was the Office Manager and a Chiropractic Assistant.

10.     Ms. Wood's final rate of pay was $21 per hour. She worked 32-34 hours per week prior to the COVID-19 pandemic.

11.     Dr. Tillou hired another Chiropractor, Matt Thomas, in January 2020.

12.     Ms. Wood began to have concerns about billing issues after Dr. Thomas was hired.

13.     Defendant submitted bills to Medicare as well as to private insurance companies.

14.     Ms. Wood's concerns included but are not limited to the following:

    a.   Dr. Tillou told Ms. Wood and Dr. Thomas that he was not charging enough. Dr. Tillou told Dr. Thomas to include certain billing codes with every visit, e.g., ultrasound of back. Dr. Thomas objected, and told Dr. Tillou that he would not charge for a service or procedure he did not provide. Dr. Tillou told Ms. Wood and Dr. Thomas, "I don't care, bill for it anyway."

    b.   When Dr. Thomas did not include the automatic billing codes on his bills, Dr. Tillou would go back in and add the code before the bill was submitted.

    c.   Dr. Tillou billed for services allegedly provided by Dr. Thomas in December 2019, before he even started in January 2020.

d.  Dr. Tillou would add comments to patients' records who were being treated for workers' comp injuries to justify providing continued services that were not needed. For example, Dr. Thomas would write that the patient was feeling better.  Dr. Tillou would change his note to indicate that the patient was not feeling better and required additional treatment.

e.  In February 2020, Ms. Wood talked to a claims adjuster about Dr. Tillou's practice of changing notes on patients' records because the adjuster questioned why the original notes (which the adjuster had seen) were subsequently changed.

f.  Dr. Tillou would omit or take out references to patients' use of opioid medications in notes provided to workers' compensation insurance carriers.

g.  Dr. Tillou would bill for services to the employer's workers' compensation insurance carrier and to the patient's private insurance, i.e., double bill.

h.  At one point, Dr. Tillou was suspended from submitting bills to Medicare, so she changed the dates on some bills to incorrectly reflect that service was provided during a period of time before she was suspended, and submitted the bills for payment.

15.  On April 2, 2020, Ms. Wood asked for and was granted permission to take time off to avoid exposure to COVID-19.

16.  Ms. Wood is at high risk because of the immune suppressant medication she takes for rheumatoid arthritis and her rheumatologist advised her to stay at home if possible.

17.     Dr. Tillou gave Ms. Wood permission to take some time off. Dr. Tillou told Ms. Wood to file for unemployment and write "lack of work" and "COVID-19" as the reason for leaving.

18.     The plan was for Ms. Wood to come back to work and continue managing the office. Dr. Tillou planned to retire in the fall. Dr. Thomas was going to take over the practice and Ms. Wood was going to continue working there as the office manager.

19.     At that time, Dr. Tillou did not ask Ms. Wood if account billing was up to date.

20.     Dr. Tillou did not express any concerns about Ms. Wood's job performance.

21.     When Ms. Wood was hired, there were four employees handling administrative tasks that, over time, were performed by only one person.

22.     Ms. Wood told Dr. Tillou several times that she was one person doing the job of four people and that she was doing her best.

23.     While Ms. Wood was laid off in April 2020, the chiropractic office did not close.

24.     Dr. Tillou and another Chiropractic Assistant kept working.

25.     The business stopped providing massages until June 2020, when three massage therapists returned to work.

26.     While Ms. Wood was laid off due to COVID-19, Dr. Tillou brought someone in to help in the office. The new office assistant handled the billing, reception, and scheduling.

27.     On May 4, 2020, Dr. Tillou reached out to Ms. Wood via text suggesting a schedule upon her return. She wrote, in part:

"So I'm thinking your return to work schedule will be Tuesday and Thursday 9-2. You will continue on unemployment and just have to indicate the earnings on your weekly filing. You will be the only one in the building…."

28.     Ms. Wood returned to work on about May 15, 2020.

4

29.     The new office assistant worked five days per week but her schedule did not overlap with Ms. Wood's schedule.

30.     Work on accounts receivable and accounts payable had fallen behind during Ms. Wood's absence. There were problems that arose while she was absent.

31.     Ms. Wood worked hard to bring the accounts current and fix problems.

32.     Dr. Tillou did not raise any concerns about Ms. Wood's job performance.

33.     The plan moved forward to have Dr. Thomas take over the practice/business when Dr. Tillou retired in the fall.

34.     Ms. Wood had a good faith belief that Dr. Tillou was submitting false claims to Medicare.

35.     Ms. Wood discussed the false claims with Dr. Thomas.

36.     Ms. Wood provided information to Dr. Thomas about the suspicious bills and he reported their concerns to the Maine Department of Professional and Financial Regulation, Office of Professional & Occupational Regulation, Complaint Division, on about June 2, 2020.

37.     Upon information and belief, Dr. Thomas quit his job with Defendant upon advice of counsel because of the false claims.

38.     On about June 14, 2020, Ms. Wood received a text from Dr. Tillou stating she (Dr. Tillou) received information that she (Ms. Wood) filed a complaint against her with the State.

39.     Dr. Tillou ended her initial message by saying, "Sorry it had to end this way." They exchanged the following messages:

Dr. Tillou:     So today I got a complaint to the licensing board from you and Matt [Thomas] accusing me of stuff that I did not do. I have never billed for a service that I did not do. I have never billed an appointment that did not happen. As far as I know we did not bill under Matt's license due to CACQ? Problems. I have always wanted accuracy in patient accounts. I never changed any of his notes. Medicare does get billed

for therapies rendered. So I will be responding to this. Sorry it had to end this way.

Me:            No I filed nothing with the board. What is ending.

Dr. Tillou:    Then Matt filed it in your name

Me:            Well, I didn't file anything.



Dr. Tillou:    Is this your signature?

Me:            Yep

Dr. Tillou     So you gave documentation to Matt and he filed against my license

Me:            He had questions I answered

Dr. Tillou:    Did you give him a written signed statement

Me:            With the info he asked for yes

40.    Dr. Tillou did not answer Ms. Wood's question about what was ending, so the following day, June 15, 2020, Ms. Wood asked her again. They exchanged these messages:

Me:            You had mentioned yesterday you are sorry it had to end this way. I've asked a few times and you've yet to clarify if you are ending my employment

Dr. Tillou:    You will remain on unemployment. Your letter is in the mail

41.    A day or so later, Ms. Wood received a letter from Dr. Tillou dated June 15, 2020, that read: "Dear Stephanie; This is your notice of permanent termination of your job at Waldoboro Chiropractic Center, PA. Debra Tillou, DC."

42.     After Ms. Wood was terminated, she asked Dr. Tillou (through counsel) to provide the reason for her termination in writing. Dr. Tillou replied in a letter dated July 15, 2020:

> "…Stephanie was put back on unemployment, early June. The business will close in September.
>
> "**With the business permanently closing, the office is now under full audit on all patient accounts.** There is a protocol for closing a medical office, and we are following those guidelines. There is evidence that the patient accounts are not correct, insurance rejected billing has pooled in Ability since 2019 waiting for corrections, claims were not processed right in rolling deductibles to patients and taking the claim out, claims were paid on by insurance and not posted so they remain open when they should have been closed, and many account adjustments, establishing evidence **that Stephanie was not performing her job on office accounts, as expected.**
>
> "Stephanie never indicated that she was having problems with the duties of her Job Description as Office Manager. . . . She apparently did not like working for the business and one has to assume the **financial misconduct listed above, was intentional**. Stephanie was terminated on June 15 for not doing her job." [Emphasis in the original.]

43.     The stated reason for Ms. Wood's termination is false and pretextual.

44.     There were no complaints about her job performance or conduct before Dr. Tillou learned that Ms. Wood assisted Dr. Thomas in reporting her false claims to the State agency that regulates Chiropractors.

45.     There were no complaints about Ms. Wood's job performance or conduct prior to her protected activity.

46.     Ms. Wood was terminated because she engaged in protected activity.

47.     Defendant told the Maine Human Rights Commission ("MHRC") that Ms. Wood and the rest of the staff had been on unemployment since the second week of March 2020. That is misleading. Ms. Wood was laid off in April and returned to work on May 15, 2020. She worked about two days per week, 5 hours per day, until she was fired on June 14, 2020.

48.     Defendant told the MHRC that the office was permanently closed due to COVID-19. That is misleading. Waldoboro Chiropractic would have continued to operate under Dr.

Tillou's management until she retired in the fall of 2020. The plan was for Dr. Thomas to take over management of the practice and for Ms. Wood to continue managing the office. Those plans changed as a direct and proximate result of Dr. Thomas and Ms. Wood reporting Dr. Tillou's fraudulent billing practices to the State.

49.     Plaintiff has established a False Claims Act retaliation claim in that (1) she engaged in protected activity, (2) Defendant was aware of her protected activity and (3) she was discriminated against because of the protected activity.

Protected activity

50.     Ms. Wood had reasonable cause to believe that Dr. Tillou was committing Medicare fraud and other illegal acts including billing for services that were not provided, billing of unnecessary services, and misrepresenting dates of service. Federal regulations set forth the minimum standards and types of chiropractic services that are billable. See https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf.

51.     It was reasonable for Ms. Wood to suspect that Dr. Tillou was committing Medicare fraud given that Dr. Tillou had been suspended from submitting bills to Medicare in the past and the behavior was fraudulent on its face.

52.     Ms. Wood discussed the fraudulent billing issues with Dr. Thomas. They were both concerned about the fraud and were motivated to make it stop.

53.     Ms. Wood believed that Defendant was defrauding Medicare and Medicaid by submitting claims and receiving payments that were inappropriate and fraudulent.

54.      Ms. Wood provided information to Dr. Thomas about the suspicious bills in an effort to stop Defendant's illegal conduct.

55.     Dr. Tillou did not promptly correct her illegal billing practices when Dr. Thomas objected. For example, when Dr. Thomas told Dr. Tillou that he would not charge for a service or procedure he did not provide, Dr. Tillou told Ms. Wood and Dr. Thomas, "I don't care, bill for it anyway."

56.     Acting, in good faith, on his own behalf and on behalf of Ms. Wood, Dr. Thomas reported their mutual concerns to a public body, i.e., the Maine Department of Professional and Financial Regulation, Office of Professional & Occupational Regulation, Complaint Division, on about June 2, 2020.

57.     Ms. Wood took steps that could reasonably lead to a False Claims Act claim.

58.     Ms. Wood reported what she reasonably believed to be fraudulent activity to a supervisor.

59.     Ms. Wood made efforts to stop what she reasonably believed to be Medicare fraud.

Adverse action

60.     Dr. Tillou was notified of the complaint Ms. Wood and Dr. Thomas made to the Department of Professional and Financial Regulation, Office of Professional & Occupational Regulation on about June 14, 2020 and responded by promptly firing Ms. Wood.

Causal connection

61.     Timing supports a causal connection between Ms. Wood's protected activity and the adverse employment action in this case.

62.     In addition, Dr. Tillou admitted that she terminated Ms. Wood because of her protected activity.

63. When Dr. Tillou told Ms. Wood she was fired, it was clear that the reason for termination was due to Ms. Wood's protected activity.

64. On about June 14, 2020, Ms. Wood received a text from Dr. Tillou stating she received information that she (Ms. Wood) filed a complaint against her with the State. Dr. Tillou ended her initial message by saying, "Sorry it had to end this way."

65. A day or so later, Ms. Wood received a letter from Dr. Tillou dated June 15, 2020, that read: "Dear Stephanie; This is your notice of permanent termination of your job at Waldoboro Chiropractic Center, PA. Debra Tillou, DC."

Legitimate, non-discriminatory reason

66. One month later, after Ms. Wood was terminated, she asked Dr. Tillou (through counsel) to provide the reason for her termination in writing.

67. Dr. Tillou replied in a letter dated July 15, 2020 that (a) Ms. Wood remained on unemployment, (b) the business was closing in September 2020, (c) she discovered that Ms. Wood was not performing her job duties satisfactorily, and (d) she alleged that Ms. Wood engaged in intentional financial misconduct against her business.

Pretext to cover up unlawful termination

68. Dr. Tillou's original reason for terminating Ms. Wood was overtly illegal. Dr. Tillou's later, stated reasons for termination are false and pretextual.

69. First: The stated reasons for termination all occurred after Ms. Wood was fired. They do not explain why Ms. Wood was fired.

70. Second: Ms. Wood asked for, and received, permission to take time off beginning on April 2, 2020 because she is at high risk for serious illness or death if she contracted COVID-19. Ms. Wood was not responsible for office work that was performed (or not performed) while

she was out of the office. (Dr. Tillou brought someone in to help in the office. The new office assistant handled the billing, reception, and scheduling.)

71.     Third: As of the time Ms. Wood was fired, the plan was for Ms. Wood to come back to work and continue managing the office. Dr. Tillou planned to retire in the fall. Dr. Thomas was going to take over the practice and Ms. Wood was going to continue working there as the office manager.

72.     Fourth: At no time prior to her termination did Dr. Tillou ask Ms. Wood if account billing was up to date. Dr. Tillou did not express any concerns about Ms. Wood's job performance or conduct before Dr. Tillou learned that Ms. Wood assisted Dr. Thomas in reporting her fraudulent billing practices to the State agency that regulates Chiropractors.

73.     Fifth: On May 4, 2020, Dr. Tillou reached out to Ms. Wood via text suggesting a schedule upon her return.

74.     Sixth: Ms. Wood returned to work on about May 15, 2020. The new office assistant worked five days per week. Their schedules did not overlap. Work on accounts receivable and accounts payable had fallen behind during Ms. Wood's absence. There were problems that arose while she was absent. Ms. Wood worked hard to bring the accounts current and fix problems. Dr. Tillou did not raise any concerns about Ms. Wood's job performance. They continued moving forward as before with the plan to have Dr. Thomas take over when Dr. Tillou retired in the fall.

75.     In sum, the subsequent "legitimate" reasons for Ms. Wood's termination are false and pretextual.

76.     Dr. Tillou terminated Ms. Wood from employment because she engaged in protected activity in violation of the FCA.

COUNT I: FCA Retaliation

77.     Paragraphs 1-76 are incorporated by reference.

78.     The anti-retaliation provisions of the FCA make it unlawful to discharge, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in an effort to stop a violation of the FCA.

79.     Defendant's conduct violates the FCA.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.     Declare the conduct engaged in by Defendant to be in violation of her rights;

B.     Enjoin Defendant, their agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.     Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.     Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's retaliation;

E.     Award equitable-relief for back pay, benefits and prejudgment interest;

F.     Award compensatory damages in an amount to be determined at trial;

G.     Award punitive damages in an amount to be determined at trial;

H.     Award liquidated damages in an amount to be determined at trial;

I.     Award nominal damages;

J.     Award attorney's fees, including legal expenses, and costs;

K.     Award prejudgment interest;

L.      Permanently enjoin Defendant from engaging in any employment practices that violate the FCA;

M.      Require Dr. Tillou to mail a letter to all employees notifying them of the verdict against Defendant and stating that Defendant will not tolerate retaliation in the future;

N.      Require that Defendant post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendant train all management level employees on the protections afforded by the FCA;

P.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of retaliation; and

Q.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated: April 27, 2021                    _/s/_ Chad T. Hansen_____
                                         Chad T. Hansen
                                         Attorney for the Plaintiff

                                         EMPLOYEE RIGHTS GROUP
                                         92 Exchange Street 2nd floor
                                         Portland, Maine 04101
                                         Tel. (207) 874-0905
                                         Fax (207) 874-0343
                                         chad@employeerightslaw.attorney